918 P.2d 344

**In the Matter of Kurt REIF, Esq., An Attorney Admitted to Practice Before the Courts of the State of New Mexico.**

No. 23630.

Supreme Court of New Mexico.

May 29, 1996.

Sally E. Scott, Deputy Chief, Disciplinary Counsel, Albuquerque, for Disciplinary Board.

Kevin J. Hanratty, Las Cruces, for Respondent.

## OPINION

PER CURIAM.

Disciplinary charges were filed against respondent Kurt Reif involving allegations of, *inter alia*, lack of diligence, incompetence, and failure to communicate. A second set of charges, based upon a complaint from the New Mexico Court of Appeals, was subsequently filed. The two specifications of charges were consolidated by the hearing committee. The consolidated disciplinary matter was resolved by a conditional agreement not to contest and consent to discipline executed by respondent, which this court approves as recommended by the disciplinary board.

The consent agreement provides for a twelve-month suspension, the imposition of which would be deferred during a twelve-month period of supervised probation. During the period of probation, Reif is required to meet with his supervisor at least once each month and abide by the supervisor's directives concerning competent representation, the volume of his caseload, and caseload management. The consent agreement specifically provides that, should Reif fail to abide by his supervisor's directives, disciplinary counsel could file a verified motion to show cause pursuant to SCRA 1986, 17–206(G), seeking revocation of the deferral of suspension. In addition, Reif was obligated to refund money to certain clients, which he did. The consent agreement also provides that, should additional complaints alleging incompetence, failure to communicate, or lack of diligence, be found to have sufficient merit to justify filing formal charges, not only would those charges be filed, but also disci-

plinary counsel could file a show cause motion seeking revocation of the deferral of suspension in this proceeding. Finally, the consent agreement provides that if Reif successfully completed his probation, he would receive a formal reprimand rather than be suspended.

In early 1992, Reif undertook to represent Ted Bonds in filing a breach of contract action arising from Paul Stout's alleged failure to pay sums he owed Bonds for the purchase of a business. In May 1992, Reif's investigator wrote to Bonds and reported that there appeared to be sufficient assets to make suit worthwhile; he also advised that a complaint was being drafted and would be filed "in the near future." Suit was not filed until January 5, 1993, almost eight months later. Shortly after suit was initiated, a notice was filed that Stout had filed a Chapter 11 bankruptcy proceeding in January 1992. Reif then filed a pleading in the bankruptcy entitled "Motion to Remand," which was denied by the bankruptcy court on the basis that no such procedure is contemplated by the bankruptcy code. Reif advised Bonds that there was little chance of recovering any money from the bankruptcy, even though he had not obtained copies of the Stout bankruptcy petition or schedules. In October 1993, the clerk of the bankruptcy court issued a notice of possible dividends, which specifically advised that a proof of claim must be filed within 90 days. Reif did not file a proof of claim.

Reif told disciplinary counsel that he did not file a proof of claim because he had not undertaken to represent Bonds in a bankruptcy proceeding. He did not, however, produce any documents that reflected this limitation on the representation or his withdrawal after initially having filed pleadings for Bonds in the Stout bankruptcy. In fact, in March 1994, he filed yet another ineffectual pleading, this one entitled, "Objection Distribution [sic] of Assets." In addition, Reif ignored the letters Bonds wrote to him for more than a year asking about the status of the bankruptcy. When Bonds finally terminated the representation, it took more than two months for him to obtain a copy of his file from Reif. Throughout the representa-

tion, Reif failed to communicate with Bonds and specifically failed to respond to numerous letters from Bonds.

In December 1993, Dan and Carol Greeley asked Reif to prepare a simple assignment of escrow contract and obtain signatures on it, in order for them to transfer their contract to purchase certain real property. Reif did not obtain all signatures on the assignment until May 1994; he did not deliver the signed agreement to the escrow company until September 1994. The tendered assignment was returned by the escrow company with a letter advising that warranty deeds were also needed, along with a recording fee and an assignment fee. The letter also notified Reif that a demand letter had been issued by the seller of the property in August 1994, because of a default in the payments on the property. The Greeleys' assignees were supposed to be making the payments, but they had ceased doing so, apparently because the assignment paper work had not been filed.

Reif neither notified the Greeleys of the information he had received from the escrow company, nor prepared the warranty deeds. Instead, he again tendered the assignment, this time with the filing fee. The tender was again rejected by the escrow company. Throughout this representation, Reif failed to keep his clients informed about the status of the matter and failed to respond to their requests for information.

The Greeleys also asked Reif to obtain the endorsement of the mortgage holder, Principal Mutual Life Insurance Company, on an insurance check for roof damage. Reif failed completely in this effort. Although he took some actions to find an address for the mortgagee, his actions were inappropriate and inept. He never did the one thing that would have instantly yielded an address: contact the New Mexico Corporation Commission. Eventually, the Greeleys contacted the insurer which had issued the check, asked to have payment stopped on the first check, and obtained a replacement check.

In December 1993, Reif undertook to represent Robert Prince on criminal charges. After Prince was convicted, Reif initiated an appeal. The New Mexico Court of Appeals, in its calendar notice, proposed to affirm.

The memorandum in opposition was due July 5, 1994. Reif did not mail the memorandum until July 8, 1994 and it was not filed until July 12, 1994. Reif did not request either an extension of time to file the memorandum or leave to file out of time; he simply sent the memorandum late.

In August 1994, Reif filed a motion to have a public defender appointed to represent Prince in the appeal. Attached to the motion was an indigency affidavit completed by Prince in November 1993. Reif filed the motion and affidavit without his client's consent and without attempting to verify that the nine-month old information was still accurate. The information was not accurate; by August 1994, Prince had been employed full time for several months, earning $6.00 per hour.

In December 1993, Reif's client, Lone Star Transportation, was seeking payment it believed was due under a contract to dismantle certain factory equipment and materials. The materials had, by that time, been loaded on railway cars. Reif filed with the Eddy County Clerk a document purporting to assert a lien under NMSA 1978, sec. 48–2–1, et. seq. The purported lien was invalid on its face, because it attempted to attach to items of personalty not attached to real property. Attached to the purported lien was a verification, which is required by statute. The verification was signed by Reif in the following manner: "George L. Jackson by Kurt Reif." This verification was then notarized by Reif's secretary. NMSA 1978, sec. 48–2–6 requires a lien claim to be verified by the claimant or some another person. Reif's approach was a nullity, being neither the oath of George L. Jackson nor Reif.

▆ The first six counts of the charges resulting from the complaint filed by the New Mexico Court of Appeals involved Reif's failure, in six different cases, to comply with the procedural rules applicable to appeals. The deficiencies noted included failure to serve the notice of appeal on the Court of Appeals, as required by SCRA 1986, 12–202(D)(1); repeated failures to paginate the docketing statement, as required by SCRA 1986, 12–305(B); repeated failures to file proofs of service for either the notice of appeal or docketing statement, as required by SCRA 1986, 12–307(C); failure to file correct or timely proofs of service after issuance of a show cause order directing him to do so; repeated failures to include a concise, accurate statement of the case in docketing statements, as required by SCRA 1986, 12–208(B)(3); repeated failures to include a list of issues presented on appeal in docketing statements, and to state how the issues had been preserved at the lower level, as required by SCRA 1986, 12–208(B)(4); failure to provide citations to the official transcript in his brief-in-chief, as required by SCRA 1986, 12–213(A)(2); and failure to state the manufacturer and model of the recording device used by Reif and the units on each side of the tape, as required by SCRA 1986, 12–213(A)(1)(c).

The final count of the charges involved Reif's trial representation of a woman charged with aggravated battery with a deadly weapon. On the night of the shooting, the woman told police that she shot the man after he began hallucinating and attempted to stop her when she tried to leave the apartment. The man had a documented history of mental illness and admitted he had been drinking and taking prescription medications on the night of the shooting. A paramedic and a detective testified that on the night of the shooting, the victim was violent, threatening, and uncooperative.

Although Reif mentioned self-defense in his opening statement, he did not pursue that theory in his trial strategy. Instead, relying on a statement from one paramedic that he had not seen a hole in the victim's pants, Reif argued that the victim shot himself and that his client had shot an unidentified (and never located) woman. In a hearing on the motion for a new trial filed by Reif after his client was convicted, Reif admitted that he never looked at the victim's pants prior to the trial; if he had, he would have found that there was indeed a hole in the pants the victim was wearing the night of the shooting. A new trial was granted on the basis of ineffective assistance of counsel.

▆ The litany of Reif's failings makes it clear that he should be grateful that the

discipline being imposed is not more severe. Isolated instances of failure to communicate and lack of diligence may not necessarily prove unethical behavior. *In re Rivera,* 112 N.M. 217, 218, 813 P.2d 1015, 1016 (1991). The same is true of an isolated instance of incompetence. A pattern of these deficiencies, however, will not only constitute misconduct but will also result in the imposition of discipline. In extreme cases, these inadequacies can result in suspension or disbarment. *See, e.g., In re Tapia,* 110 N.M. 693, 799 P.2d 129 (1990); *In re Allred,* 106 N.M. 227, 741 P.2d 830 (1987).

■ Reif's inadequacies are certainly serious, if not extreme. It is apparent from these charges that he either has undertaken too many cases to give proper attention to each client's legal matter, or that he has undertaken cases in areas in which he neither has the requisite legal knowledge nor has taken the time to obtain it. Rule 16–101 of the Rules of Professional Conduct defines competence as requiring "the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." This standard is not met if a lawyer files a lien that can only attach to real property, against personal property loaded on a railway car. It is not met by not bothering to advise clients that additional documents are needed to complete a real estate transaction. It is not met by requesting relief in bankruptcy that does not exist or by filing a pleading that bears no plausible relationship to a proof of claim. It certainly is not met by failing to comply with the admittedly precise procedural requirements of appellate practice. Lawyers cannot shoot from the hip and have any hope of complying with their obligation to provide competent representation.

■ Similarly, it is no excuse to charges of lack of diligence and failure to communicate to say that the lawyer is too busy. Rule 16–103 requires a lawyer to "act with reasonable diligence and promptness in representing a client." Sometimes, of course, an action may not be taken instantly because of the press of other business. That does not mean that it is acceptable to take eight months to file a complaint or nine months to execute and deliver an uncompli-

cated assignment of a real estate contract. It is never acceptable to miss applicable appellate deadlines; if an act cannot be performed in a timely fashion, the lawyer should request an extension or, as a last resort, seek leave to file out of time.

■ Finally, the lawyer has a duty to his clients to keep them informed about the status of their legal matters and to promptly respond to requests for information. It is not acceptable to fail to return a telephone call for days or weeks or not at all or to not respond in any way to a letter from a client. The duty to communicate is an affirmative one; the lawyer must tell the client what is going on and, if additional information is needed, the lawyer must request it. The lawyer cannot leave it to the client to initiate communication and still satisfy his obligations under Rule 16–104. *In re Carrasco,* 106 N.M. 294, 295, 742 P.2d 506, 507 (1987).

■ Reif has exhibited all these failings. He should harbor no illusion about the predicament in which he currently finds himself. The burden is squarely on him to demonstrate that he can provide competent and diligent representation to his clients and that he can adequately communicate with them while doing so. It may be that it will be necessary for him to drastically reduce his caseload in order to provide a level of representation that is consistent with his ethical obligations. This will be a matter for his supervising attorney to decide; Reif should understand clearly that if his supervisor says he must reduce his caseload, he must do so. The price of his inability to practice competently and diligently is the loss of a portion of his autonomy as a lawyer. The same is true of the other directives of his supervisor. It is not the supervisor's duty to cajole, beseech, or compel Reif to follow his directives. The supervisor is acting as this Court's agent in providing guidance to a lawyer placed on probation. When the court orders a lawyer to comply with the supervisor's directives, that is just what it is: an order.

■ We emphasize the supervisor's authority and Reif's obligation because we wish to make it perfectly clear that Reif's failure to live up to the terms of his probation

would, in all likelihood, result in the revocation of the deferral of his period of suspension. The choice and the burden are his. To succeed in his probation, Reif must be willing to learn new ways of doing things; his current methods have proven to be inadequate. That this discipline is imposed pursuant to a consent agreement lessens his task not one bit. "Strict compliance with the terms of the consent agreement is required as with any discipline imposed by this Court." *In re Schmidt*, 118 N.M. 213, 215, 880 P.2d 310, 312 (1994).

NOW, THEREFORE, IT IS ORDERED that the conditional agreement not to contest and consent to discipline is APPROVED and the discipline set forth therein is imposed;

IT IS FURTHER ORDERED that Kurt Reif hereby is suspended from the practice of law for one (1) year, pursuant to SCRA 1986, 17–206(A)(5), effective May 9, 1996;

IT IS FURTHER ORDERED that the one-year suspension period hereby be and hereby is deferred;

IT IS FURTHER ORDERED that Reif shall be placed on probation for one year with the following conditions:

(1) He shall be supervised by a licensed New Mexico attorney selected or approved by a disciplinary counsel;

(2) He shall meet with his supervisor on such regular basis as directed by the supervising attorney and that such meetings will occur no less than once per month;

(3) He shall abide by his supervisor's directives concerning the competent representation of his clients;

(4) He shall confer with his supervisor at least once per month regarding the volume of his caseload and he shall abide by the supervising attorney's determination of whether he may accept new cases and, if so, the number of new cases he may accept, which determination will be based upon a showing by Reif that he has the time and expertise needed to handle his caseload competently and with reasonable diligence, including but not limited to having sufficient time to communicate adequately with clients and opposing counsel, conducting research, filing appropriate pleadings, and conducting or responding to discovery;

(5) He shall accept instruction from his supervisor in the areas of law office management, caseload management, and the development of a system for prompt communication with clients and opposing counsel, and shall demonstrate his understanding of these matters to the satisfaction of his supervisor;

(6) Any failure to follow all reasonable directions from the supervising attorney in a prompt and satisfactory manner may result in disciplinary counsel filing a verified motion to show cause, pursuant to SCRA 1986, 17–206(G), seeking revocation of the deferred status of the suspension;

(7) He shall observe all Rules of Professional Conduct and Rules Governing Discipline;

(8) He shall remit to Dan and Carol Greeley the sum of $209.23 and provide to the Greeleys an accounting of the funds he held in trust for them;

(9) He shall promptly and timely respond to any and all complaints filed with the disciplinary board and any requests from disciplinary counsel for additional information relating to such complaints;

(10) If any complaints alleging incompetence, lack of diligence or failure to communicate are found by disciplinary counsel to have sufficient merit to justify filing formal charges, additional formal charges will be filed, and a verified motion to show cause may be filed pursuant to SCRA 1986, 17–206(G), to seek revocation of the deferred status of the suspension; and

(11) Upon successful completion of his probationary period, he shall receive as a sanction a formal reprimand, which shall be filed in the Supreme Court Clerk's office and published in the *State Bar Bulletin* pursuant to SCRA 1986, 17–206(D).

IT IS FURTHER ORDERED that this order has the force and effect of a judgment; and

IT IS FURTHER ORDERED that Reif shall pay the costs of this proceeding in the amount of $108.87 on or before July 8, 1996, and any amount unpaid by this date shall

accrue interest at a rate of fifteen percent (15%) per annum.

IT IS SO ORDERED.

MINZNER, J., not participating.